STATE OF WEST VIRGINIA

*v.*

CLARENCE FRANKLIN MCNEAL

(No. 13954)

Decided July 11, 1978.

Rehearing Denied January 25, 1979.

*Leo Catsonis, Thomas L. Linkous, Catsonis & Linkous,* for plaintiff in error.

*Chauncey H. Browning*, Attorney General, *Gregory E. Elliott*, Assistant Attorney General, for defendant in error.

McGRAW, JUSTICE:

Defendant, upon a plea of not guilty, was convicted by a jury on June 17, 1976, of robbery by violence and was sentenced to a term of forty years in the penitentiary.

The record indicates that on December 9, 1975, at approximately 9:40 o'clock P.M., two black men approached the pay booth at an Exxon Station in Charleston, West Virginia, and purchased a small container of gasoline. Shortly thereafter they returned, one sloshed gasoline through the window, and the other ignited it with a match. The attendant, Kincaid, who was forced to flee the booth, was immediately accosted by one of the men holding a knife who screamed in a stuttering voice "Give me your ... money or I will cut your ... guts out."

At approximately the same time a customer, Frame, had pulled on the lot, saw the fire, and was accosted by one of the men with a knife. Frame returned to his car, got a bumper jack and started chasing one of the fleeing men. The man he was chasing dropped four or five five-dollar bills which Frame retrieved. Mr. Frame could not positively identify the defendant as being the man he encountered and chased.

Officers Sayre and Taylor were in the area when they received a call to proceed to the Exxon Station on Florida Street. After a short conversation with the attendant, Mr. Kincaid, the officers proceeded in the direction where appellant had fled. The police officers encountered seventeen-year old Robert Coston, who, while returning to his home located near the Exxon station, observed the fire and saw someone running. He identified by name, the defendant, as the person running down a nearby street. He stated that he heard the defendant stuttering something that sounded like, "Mama, Mama, call the fire truck."

Afterwards, Officers Sayre, Taylor, Bush, Rinehart, and Williams proceeded to 1422-½ Second Avenue. They knocked on the door, identified themselves, and waited "five or ten minutes" until a stuttering male identified himself as "Jason Hill" but would not open the door. Then, presumably on the basis that one of the assailants allegedly stuttered, after calling for and receiving permission from a superior officer, the police kicked down the door and entered the house. When the police entered, they found the defendant sitting by the kitchen table with a small paring knife laying beside his arm. After a search, no money was found and the only item seized was this knife which was later introduced into evidence. Officer Sayre read the defendant his rights, and when the tenant, Otis McNeal, and the landlord appeared at the house, he again read the rights to defendant. Later, Exxon employee Kincaid was brought to the house and spontaneously identified the defendant, who was sitting in a chair handcuffed with the two other black men standing beside him.

Defendant was taken to the detective bureau and signed a waiver of rights around 11:40 P.M. but refused to make a statement. Defendant spent the night in jail and at 7:30 A.M. the next morning was taken to municipal court where he signed an affidavit of indigency requesting that counsel be appointed. Immediately thereafter, Officer Leonard took defendant back to the detective bureau to take a statement. Defendant signed a waiver at 8:20 A.M. and made a confession which, over objection, was read in its entirety to the jury and admitted into evidence. Officer Leonard testified as follows concerning the taking of the confession:

> Q. I believe you told me originally in your testimony that you picked this man up downstairs from Municipal Court?
>
> A. Yes, sir.
>
> Q. Did you know at the time that he had requested the Court to appoint a lawyer for him, had signed an affidavit for that?

A. Yes, sir.

Q. So, at the time you took him and he made this statement to you, he had signed an affidavit with the Police Court?

A. Yes, sir.

Q. Requesting that he be appointed a lawyer?

A. Yes, sir.

There was testimony at trial to the effect that the defendant was a very emotional person who "went to pieces" in a crisis. The two physicians appointed on behalf of the defendant agreed, however, that defendant was competent to stand trial. At the time of the trial he was twenty-three years of age, had completed the eighth grade and had been discharged from the Army after nine weeks of basic training because he could not adapt to army life. He worked as a janitor for the phone company and lived with his sister. He apparently had been drinking all day on December 9th. He and his cousin, Otis McNeal, stated that Otis had taken the defendant to Otis' home at 1422-½ Second Avenue between 8:30 and 9:00 P.M. and put him to bed because of his intoxicated condition.

Defendant now appeals contending:

1. The court erred by admitting the "confession" into evidence over objection.

2. The court erred by admitting into evidence the paring knife seized at the time of the arrest.

3. The court erred by admitting evidence of the pretrial identification and by permitting the State to buttress the in-court identification on the basis thereof.

4. The defendant was otherwise denied due process of law.

I

As to the confession, the State correctly points out in its brief that, "[T]he entire issue revolves around the

question of whether appellant requested counsel prior to the taking of the statement."

As indicated above, the police officer who elicited the confession admitted on cross-examination that the defendant, before making the statement, had requested counsel. This is further documented in the record by the affidavit of indigency sworn to and signed by the defendant in Municipal Court asking that counsel be appointed. Since it is clear that the confession was made after the appearance in Municipal Court, there is little doubt that counsel was requested by the defendant before he made the confession.

This assignment of error is resolved by the case of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed.2d 694 (1966) wherein the Court held at 474, 86 S.Ct. at 1628, 16 L. Ed.2d at 723 that "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present."

The Fourth Circuit has consistently followed this *per se* rule in such cases as *Ferguson v. Boyd*, 566 F.2d 873 (4th Cir. 1977); *United States v. Clark*, 499 F.2d 802 (4th Cir. 1974); and *United States v. Slaughter*, 366 F.2d 833 (4th Cir. 1966). Recently in *Strickland v. Garrison*, No. 76-1683 (4th Cir. June 26, 1976), an unpublished *per curiam* opinion, that Court succinctly summarized the meaning of *Miranda:*

> Once a suspect in custody has expressed his wish to be represented by counsel, the police must deal with him as if he is thus represented. Thereafter, it is improper for the police to initiate any communication with the suspect other than through his legal representative, even for the limited purpose of seeking to persuade him to reconsider his decision on the presence of counsel.

The State contends that the defendant waived his rights to counsel and to remain silent. But, the United States Supreme Court in *Brewer v. Williams*, 430 U.S. 387, 404, 97 S. Ct. 1232, 1242, 51 L. Ed.2d 424, 439-40

(1977). recently restated that the burden is on the State to prove an intentional relinquishment or abandonment of a known right or privilege, *see e.g., Brookhart v. Janis,* 384 U.S. 1, 4, 86 S. Ct. 1245, 1247, 16 L. Ed.2d 314 (1966); *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 1023, 82 L. Ed. 1461, 1466 (1937); and how courts indulge in every reasonable presumption against waiver, *Glasser v. United States,* 315 U.S. 60, 70-71, 62 S. Ct. 457, 464-65, 86 L. Ed. 680, 699-700 (1941); *Johnson v. Zerbst, supra.* We feel that the State has failed to meet its burden of proving waiver in this case.

We, therefore, hold that the defendant's confession, having been obtained in violation of his rights under the Fifth and Fourteenth Amendments to the United States Constitution, should not have been admitted into evidence.

## II

Both the West Virginia and United States Constitutions protect the rights of citizens from unreasonable searches and seizures in their houses. W.Va. Const. art. III §6; U. S. Const. amend. IV.

This Court has for over fifty years stressed the necessity of a warrant. For example, in *State v. Slat,* 98 W. Va. 448, 449-50, 127 S.E. 191, 192 (1925), *accord, State v. Wills,* 91 W. Va. 659, 114 S.E. 261 (1922), it was held that:

> Any search of a person's house without a valid search warrant is an unreasonable search under Sec. 6, Art. 3, Constitution of West Virginia ... Being unreasonable, it is unlawful ... if the warrant be not so issued ... it is void, and the search, seizure and arrest thereunder are unreasonable.

The fundamental guiding principle in this area of law today, set forth in *Katz v. United States,* 389 U.S. 347, 357, 88 S. Ct. 507, 514, 19 L. Ed.2d 576, 585 (1967), *Coolidge v. New Hampshire,* 403 U.S. 443, 454-55, 91 S. Ct. 2022, 2023, 29 L. Ed.2d 564, 576 (1971); *Mincey v. Arizona,* 46 U.S.L.W. 4737, 4738 (June 21, 1978); and *State v. Du-*

*vernoy,* 156 W. Va. 578, 583, 195 S.E.2d 631, 634-35 (1973) is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specially established and well-delineated exceptions." *See State v. Duvernoy, supra,* for a listing of these limited exceptions to the search warrant requirement.

In the absence of one of these "jealously and carefully drawn" exemptions, *Jones v. United States,* 357 U.S. 493, 499, 78 S. Ct. 1253, 1257, 2 L. Ed.2d 1514, 1519 (1958), based upon an exigency of the situation making that course imperative, *Mincey v. Arizona,* 46 U.S.L.W. 4737, 4739 (June 21, 1978); *McDonald v. United States,* 335 U.S. 451, 456, 69 S. Ct. 191, 193, 93 L. Ed. 153, 158 (1948), the police must obtain an arrest warrant before entering a home to seize a person. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed.2d 564 (1971). The burden of proving that exigent circumstances made a warrantless arrest imperative is upon those who seek the exception. *Id.* at 455, 91 S. Ct. at 2032, 29 L.Ed.2d at 576; *Chimel v. California,* 395 U.S. 752, 762, 89 S. Ct. 2034, 2039, 23 L. Ed.2d 685, 693 (1969); *United States v. Jeffers,* 342 U.S. 48, 51, 72 S. Ct. 93, 95, 96 L. Ed. 59, 64 (1951); *McDonald v. United States, supra* at 456, 69 S. Ct. at 193, 93 L.Ed. at 158-59.

In the instant case, five police officers descended upon a private residence, kicked the door down, entered and seized the person of the defendant whom they arrested and handcuffed, searched the house and seized a paring knife, and then brought the victim of the crime, the service station attendant, into the house where he identified the handcuffed defendant as the guilty felon. Before making the dramatic entry, however, the police asked for and received "permission" from superior officers to break down the door.

The State argues that the entry resulted from an "exigency" in that the police were in "hot pursuit" of a fleeing suspect. But this is not a case like *Warden v.*

*Hayden*, 387 U.S. 294, 87 S. Ct. 1642, 18 L. Ed.2d 782 (1967), the leading authority on "hot pursuit." In *Hayden*, an armed robber victimized the business premises of a cab company. The police were radioed by the cab company dispatcher that two cab drivers, attracted by shouts of "Holdup," had *followed* a man to a certain house. *Within five minutes,* the police knocked on the door and asked a Mrs. Hayden for permission to enter. She offered no objection, and the police entered and found the defendant, Bennie Joe Hayden, feigning sleep in an upstairs bedroom. A shotgun, a pistol, ammunition, and identifiable clothing, all introduced against defendant at trial, were found elsewhere in the house. The Court upheld the entry and search.

In the instant case, no one saw the defendant enter the home on Second Avenue. Although the seventeen-year-old student, Robert Coston, told the police that he had seen "Chip" McNeal running down the street shortly after he saw the fire, it does not appear in the record that Coston informed them, before the arrest, of any address where McNeal might be found. On direct examination he testified that he had seen McNeal come in or go out of the house at 1422-1/2 Second Avenue in the past. But neither he nor the police testified that Coston directed them in any way to that residence. It is unclear from the record why the officers entered that particular residence approximately twenty-five to thirty minutes after the crime.

Upon close review of the record and briefs we conclude that the State has not met its burden of showing an exigency that made its particular course of action imperative. Surely four of the five police officers could have guarded the personal residence while the fifth sought a warrant. In the present case, the officers apparently had time to seek and receive permission to enter from their superiors. Such an authorization should have instead been sought from a neutral and detached magistrate. *People v. Heard,* 65 Mich. App. 494, 237 N.W.2d 525 (1975); *see also United States v. Weinberg,* 345 F. Supp. 824, 838

(E.D. Pa. 1972) where evidence seized from the defendant at the time of his arrest at his office was suppressed because "there would appear to have been adequate time to obtain a warrant for his arrest and no explanation was given for failure to obtain such a warrant."

This issue is well-explained by Justice Douglas in *McDonald v. United States*, 355 U.S. 451, 455-56, 69 S. Ct. 191, 193, 93 L. Ed. 153, 158 (1948):

> We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.

"We, therefore, find this arrest to be unlawfully made without a warrant. Since evidence obtained as a result of an unlawful search, seizure or arrest is inadmissible against the accused upon his trial, syl. pt. 6, *State v. Thomas*, ___ W. Va. ___, 203 S.E.2d 445 (1974); *State v. Wills*, 91 W. Va. 659, 114 S.E. 261 (1922); *Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed.2d 1081 (1960), the trial court erred in admitting into evidence the knife found on the table beside the defendant when he was unlawfully arrested inside his cousin's house.

## III

The defendant argues that the identification was unreliable, unduly suggestive and inadmissible on retrial. In syllabus point three of *State v. Casdorph*, \_\_\_ W. Va. \_\_\_, 230 S.E.2d 476 (1976), we recently restated the law governing the admissibility of suggestive identifications based upon the controlling cases of *United States v. Wade*, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed.2d 1149 (1967); *Gilbert v. California*, 388 U.S. 263, 87 S. Ct. 1951, 18 L. Ed.2d 1178 (1967); *Stovall v. Denno*, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed.2d 1199 (1967), and *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed.2d 401 (1972):

> In determining whether an out-of-court identification of a defendant is so tainted as to require suppression of an in-court identification a court must look to the totality of the circumstances and determine whether the identification was reliable, even though the confrontation procedure was suggestive, with due regard given to such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

It is true that a one-on-one showing of a handcuffed suspect, surrounded by police in a home forcibly entered, does leave a lot to be desired. Such a procedure is suggestive and, in the absence of an exigent circumstance, unnecessary. But, should suggestive and unnecessary identification procedures *per se* be excluded without regard to reliability? Since *Biggers*, some courts of appeals, *e.g.* the Second Circuit, have adopted this *per se* rule and have focused on the procedures employed, excluding all identification evidence obtained through unnecessary suggested procedures. *See Smith v. Coiner*, 473 F.2d 877 (4th Cir. 1973). The other approach is to permit reliable confrontation evidence to be admitted despite its tainted origin.

The United States Supreme Court resolved the issue in *Manson v. Brathwaite*, ___ U.S. ___, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) and expressly rejected the *per se* rule by concluding that "reliability is the linchpin in determining the admissibility of identification testimony." *Id.* at ___, 97 S. Ct. at 2253, 53 L. Ed.2d at 154. To determine reliability, the courts are to look at the suggestive identification in light of the factors listed in *Biggers, supra.* These factors, which have already been adopted by this Court in the syllabus point from *Casdorph* reproduced above, include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the length of time between the crime and the confrontation.

This Court must consider these factors in light of the facts of this case.

> 1. *The opportunity to view.* Kincaid testified that the stuttering defendant and another black male first came to the self-service gas station pay booth window with a gallon Clorox container and bought some gas. The defendant stood five or six feet away. Then after the cars on the lot left, the defendant, according to Kincaid, approached the window again, this time "sloshing" gas through the small window into the booth. He says the defendant then ran around to the only door into the booth and waited for Kincaid to exit, armed with a butcher knife. He states he did not come out immediately, but waited up to one or one-and-a-half minutes, and thus had additional time to observe those who waited for him outside the door.

> 2. *The degree of attention.* Kincaid was not a casual or disinterested passerby. He was the robbery victim trapped while at work in a small glass pay booth while the would-be robbers waited on the other side of the glass for him to exit. Prior to that he had "waited on" them and sold them the gas. He also said he watched the de-

fendant enter the burning booth then hastily leave the scene. Such a series of events would seem to be met with a high degree of attention by the employee Kincaid.

3. *The accuracy of the description.* Kincaid's only description of the felon given prior to the identification was that the defendant stuttered.

4. *The witness' level of certainty.* Kincaid said the police approached him and said they wanted to see him for a minute and asked him to go with them. He said nothing was said to him about why or where they were going. He testified that as he entered the residence he recognized the defendant as the one who threw the gas in and tried to rob him. Officer Sayre testified that as soon as Kincaid walked through the door he spontaneously pointed to the defendant and said, "That is the guy that robbed me!" Kincaid testified twice that there was no doubt or question in his mind that the defendant was one of the two men who robbed him. There was no uncertainty in his testimony.

5. *The time between the crime and the confrontation.* Kincaid testified that approximately forty-five minutes elapsed between the crime and the confrontation.

We cannot say, upon considering the suggestive identification procedure and the above factors of reliability, that there is "a very substantial likelihood of irreparable misidentification." *Manson v. Brathwaite, supra* at ____, 97 S. Ct. at 2254, 53 L. Ed.2d at 155; *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 971, 19 L. Ed.2d 1247, 1253 (1968). Since the United States Supreme Court has expressly rejected the use of a *per se* exclusionary rule in such a case, the admission into evidence of the identification by Kincaid did not deny defendant due process of law.

But, nevertheless, for the reasons given earlier, the judgment of the Circuit Court of Kanawha County is

reversed, and this case is remanded to that court so that the defendant may be awarded a new trial.

*Judgment reversed;*
*new trial awarded.*

NEELY, JUSTICE, *dissenting:*

I dissent from the Court's holding that the warrantless entrance into the defendant's residence was illegal. The police were informed that an armed robbery had taken place, the defendant had fled. As stated in *Warden v. Hayden*, 387 U.S. 294 (1964), "the exigencies of the situation made that course imperative." 387 U.S. at 298. While the Fourth Amendment makes warrantless searches *per se* unreasonable, it does not require officers to stop in the course of an investigation if to do so would endanger lives or help effect an escape. *Warden v. Hayden, supra.* Here, the police were in "hot pursuit" of the defendant, (although admittedly they did not have him in plain view, but rather were following a very warm trail) had reasonable grounds for arrest, and could reasonably believe weapons might be destroyed or wielded against them, or an escape effected if immediate entrance were not made. This case comes squarely within the exceptions established by *Warden v. Hayden, supra,* to warrant requirements and no policy of protecting citizens from unreasonable searches is served by the majority's holding on this point.