331 S.E.2d 829

**STATE of West Virginia**

v.

**Kathy J. SCHOFIELD.**

**Kathy J. SCHOFIELD**

v.

**W. Joseph McCOY, Commissioner of West Virginia Department of Corrections.**

**Nos. 16245, 16389.**

Supreme Court of Appeals of West Virginia.

Feb. 28, 1985.

Rehearing Denied June 11, 1985.

Dissenting Opinion July 12, 1985.

Barbara H. Fleisher, Preiser & Wilson, Charleston, for Kathy J. Schofield.

Silas B. Taylor, Asst. Atty. Gen., Charleston, for State and McCoy.

NEELY, Chief Justice:

Kathy Schofield's appeal and writ of habeas corpus are consolidated in this opinion because both address the validity of her conviction. For the reasons given below, the appellant's appeal is denied and her writ of habeas corpus is likewise dismissed.

James Preston Gill was shot in the back by a .22-caliber bullet on the night of 2–3 May 1982. A forensic pathologist testified that the bullet was fired from a distance of

two feet or more and that both the victim and the murderer were standing at the time. The body was discovered in the afternoon hours of 3 May 1982 just inside the slightly ajar door of the victim's apartment above Buffington's Bar in Parkersburg.

James Gill was a regular patron of the establishment over which he lived. On 2 May 1982, Miss Kathy Jo Schofield, a young unwed mother, was seen at the bar with the victim and was overheard offering him her "company." (The appellant later explained that this remark was a reference to prostitution services.) Apparently the victim accepted her offer, for a few minutes later he left the bar followed shortly by Miss Schofield. Miss Schofield reappeared at Buffington's later that night and had a few beers. Sometime after midnight, she summoned a taxi, dined at a restaurant, and hired another cab to take her home.

As a result of inquiries made after Mr. Gill's corpse was discovered, the Parkersburg police sought out Miss Schofield believing that she was the last person to have been with the victim. The police learned that she lived with her parents and child in a trailer outside Belpre in Washington County, Ohio. The Parkersburg police relayed their desire to interview Miss Schofield to the sheriff of Washington County and the Belpre police department. Ohio law enforcement officers subsequently appeared at Miss Schofield's trailer at midmorning on 3 May 1982 and told her that two Parkersburg detectives wished to speak with her at the Belpre City Hall. The appellant consented to speak to the West Virginia authorities although she testified that she knew she was under no obligation to do so. (The officers explained to her that she did not have to accompany them.)

The Parkersburg detectives asked Miss Schofield to cross the Ohio River and speak with them in Parkersburg. The detectives explained to Miss Schofield that she was not under arrest, did not have to answer any questions, and that she was free to leave whenever she wished. The appellant replied that she understood and agreed to

come with the officers to West Virginia but wished to return to her baby as soon as possible.

Miss Schofield learned that she was a suspect in the shooting death of James Gill. Her *Miranda* rights were read to her with care one line at a time. She read and signed the *Miranda* form and a waiver that she knew that she could remain silent. Miss Schofield later testified that she was uncertain that she really was free to get up and leave.

Miss Schofield admitted during questioning that she knew the victim and had been with him at Buffington's and in his apartment on the night of Mr. Gill's death. At one point the detectives asked her if she had shot James Gill to which she laughed and answered affirmatively that she had "shot him to see what it was like to kill someone," but then quickly added she was only joking. When one of the detectives suggested that she should consider her baby daughter's future, the appellant, infuriated, abruptly concluded the conversation and immediately took a cab to Belpre.

During the afternoon of 4 May 1982, Detective Douglass of the Parkersburg Police Department acquired a warrant to search Kathy's trailer. Based on the West Virginia warrant an Ohio search warrant was subsequently issued in Marietta, Ohio and taken to the Schofields' trailer by a deputy of the Washington County sheriff's department. This detective was accompanied by four members of the Parkersburg Police Department. Since no one was then at home, the officers waited until Miss Schofield's parents were summoned to the trailer who, at 5:30 p.m., admitted the officers and directed them to their daughter's room. Two wallets containing James Gill's identification and effects, the .22-caliber revolver (all hidden under blankets in a dresser), as well as a purse containing .22-caliber shells were found in the appellant's room. The validity and fruits of this search warrant are not disputed on appeal.

Anticipating that the search of the Schofield trailer would incriminate the appellant, the Parkersburg Police Department had a patrolman standing by in Parkers-

burg waiting for an order to obtain an arrest warrant. Immediately after the trailer's search this patrolman was instructed telephonically to procure a warrant. Although ample probable cause existed, the patrolman did not relay adequate information to the Wood County magistrate to establish why the police believed they had "probable cause" to arrest Miss Schofield. Inexplicably the officer simply stated that Kathy Schofield murdered James Gill because: "James Gill was shot to death." He later testified that he affirmed under oath that the information contained in the complaint was correct and that the magistrate perfunctorily issued the arrest warrant without further ado.

Thereafter the Parkersburg Police Department telephoned the Washington County sheriff's office and told them that a warrant for Miss Schofield's arrest had been executed in West Virginia and requested that Miss Schofield be arrested and held pending extradition. Based on this information, the Ohio authorities arrested the appellant in one of her brothers' trailers. An Ohio deputy testified at trial that he gained entry into the trailer as follows:

I knocked on the door, a male came to the door, invited me in, I told him I was looking for Kathy. He stated Kathy was in the trailer. After I entered the trailer I observed Kathy sitting in the chair. I knew it was Kathy because she had identified herself as Kathy Schofield and also Captain Birch knew her and identified her as being Kathy Schofield.

I told her that I had a teletype and that she was being charged in West Virginia with murder and I was going to arrest her on a fugitive from justice charge. She was handcuffed. She was very upset and I took her out of the trailer.

After some initial excitement, with appellant in hysterics on seeing her baby in a detective's arms and one of her brothers taking a blow at an arresting officer, appellant calmed down. Miss Schofield testified that, upon being read her constitutional rights, she had understood her right to be silent but stated she was unaware that a lawyer could be provided to her without charge. Her mother, however, reiterated her right to remain silent until she had a lawyer.

Nonetheless, Miss Schofield began to tell the officers "what happened" on the night of Mr. Gill's death. The officers testified that she spoke spontaneously and was not answering questions. At trial, however, Miss Schofield insisted that she only spoke in order to get the officers "off my back." She admitted that she knew that she could remain silent.

Miss Schofield told the investigating officers that she and "Buddy," a friend of hers, had planned to rob Mr. Gill and it was "Buddy" who ultimately shot the victim. No "Buddy" was ever found however, despite a thorough search of the neighborhood by the police. Nor had anybody else ever met this alleged accomplice.

Miss Schofield later at trial admitted that she fabricated the "Buddy" story. In fact, she stated, she shot Mr. Gill herself but did so in self-defense and in response to his sexual advances. Miss Schofield testified that she was "emotionally upset" when she killed the victim and that she had been abused by Mr. Gill in the past. Furthermore, on the night in question, she testified, she was under the influence of drugs and Mr. Gill goaded her by calling her a coward. She fired the revolver once "just to scare him" but the victim turned his back on her and "kept walking away." In response "... I pulled the trigger again and shot him and he fell to the ground."

Miss Schofield noted that she apologized to her victim before he expired. After he died she searched his pockets for a list of prostitutes kept by the victim that apparently included her. Finding the list, she also took pornographic photographs that Mr. Gill had taken of her and the victim's wallet. She then left the apartment.

I

The appellant's brief contains numerous assignments of error that we shall address *seriatim*. The appellant first maintains that the Circuit Court of Wood County erred in admitting post-arrest statements

into evidence since these statements about "Buddy" and that she had been "framed" were the product of an unlawful arrest and thus, under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the "fruit of the poisonous tree." As such, the appellant argues, they could not be admitted into evidence against her. Although this Court agrees that the West Virginia arrest warrant issued by the Parkersburg magistrate was defective, we hold nonetheless that, under the circumstances, Miss Schofield's arrest was valid and that the entry to her brother's trailer to arrest her was not unlawful.

■ An affidavit for an arrest warrant that stated only that the victim was shot to death does not enable a magistrate to conclude that sufficient probable cause exists for him to issue the warrant. Indeed, under *W.Va. Const.* art. III, § 6, and the Fourth Amendment to the *U.S. Constitution* a magistrate cannot be a rubber stamp for the police. The magistrate issuing the warrant must make an independent judicial decision for himself based upon the information provided to him by the police before he can issue a warrant. *See e.g., State v. White*, 167 W.Va. 374, 280 S.E.2d 114 (1981); *State v. Wotring*, 167 W.Va. 104, 279 S.E.2d 182 (1981); *State v. Dudick*, 158 W.Va. 629, 213 S.E.2d 458 (1975).

Nonetheless, the Supreme Court has refused to apply the exclusionary rule to cases in which the officer conducting the search acted in objectively reasonable reliance on a warrant issued by a magistrate that was later determined to be invalid. In *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) Justice White wrote:

"Imposition of the exclusionary sanction is not necessary meaningfully to inform judicial officers of their errors, and we cannot conclude that admitting evidence obtained pursuant to a warrant while at the same time declaring that the warrant was somehow defective will in any way reduce judicial officers' professional incentives to comply with the Fourth Amendment, encourage them to repeat their mistakes, or lead to the granting of all colorable warrant requests." 468 U.S. at 918–19, 104 S.Ct. at 3418–19. *See also Massachusetts v. Sheppard*, 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984).

Whether, however, this case would come within *Leon's, supra,* exception to the good faith defense that disallows the defense if the warrant is facially defective is problematic; nevertheless we need not reach that issue in this case because a warrantless arrest was entirely justified.

No one contends that the appellant's arrest warrant was valid. The state's brief admits that the patrolman "did an infuriating and inexplicable thing" by failing to present the magistrate with the cornucopia of information his colleagues had gathered. However, this mistake is not dispositive of the question whether the post-arrest statements made by the defendant were admissible. Furthermore, we note that the magistrate who issued the warrant was not misled by its admittedly scanty contents nor did the affiant believe his information was false. *See United States v. Leon, supra.*

■ Although Miss Schofield was "the target" of the police entry into her brother's trailer and was legitimately on the premises at his request, no privacy expectation protected by *W.Va. Const.* art. III, § 6 and the Fourth Amendment to the *U.S. Constitution* existed that applied to her. Admittedly the arrest warrant was defective, but Miss Schofield was a visitor to her brother's trailer without any authority or control over the premises or any interest in the premises. Indeed, on the facts of this case, no claim could be sustained that her brother's privacy rights were violated. But even if a breach of her brother's privacy interest could somehow be found, she would not be able to rely on such a breach to exclude evidence from her own trial. Fourth Amendment rights are personal rights.

■ This Court notes the plethora of evidence before the arresting officers that permitted them to infer that Miss Schofield had committed a felony. *See State v. Craft*, 165 W.Va. 741, 272 S.E.2d 46 (1980).

The arresting officers knew that James Gill had been murdered and robbed with a .22-caliber revolver. The victim's wallet and a .22-caliber revolver were found wrapped in a blanket in the appellant's wardrobe. Thus, abundant probable cause existed to arrest Miss Schofield despite the absence of a proper arrest warrant.

■ Since Miss Schofield was not arrested in her own home, the strictures of the Supreme Court requiring a valid warrant absent exigent circumstances *to arrest a person in his own home are inapplicable. Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Most recently this Court set forth its criteria for determining whether a lawful arrest can be made without a warrant in a person's own home in *State v. Farmer*, 173 W.Va. 285, 315 S.E.2d 392 (1983). In *Farmer, supra,* we strengthened the ramparts of every man's castle and upheld a high standard for police to satisfy before they make a warrantless arrest for a felony *in a person's home.*

However, the appellant was *not* at home when she was arrested. As the U.S. Supreme Court stated in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), "[T]he Fourth Amendment protects people, not places," *Id.,* at 351, 88 S.Ct. at 511 and, accordingly, Miss Schofield cannot rely on her brother's privacy interests. This Court recently quoted with approval the Supreme Court in *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); in *State v. Tadder*, 173 W.Va. 187, 313 S.E.2d 667 (1984):

A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment Rights infringed. *Id.,* 173 W.Va. at 190, 313 S.E.2d at 670.

■ Although Miss Schofield did not have a legitimate expectation of privacy while visiting her brother in his trailer-house, she insists that the police needed a search warrant to justify entering her brother's home. The appellant relies on *Steagald v. United States*, 451 U.S. 204,

101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) where the police entered the defendant's home without warrants either for his arrest or to search the premises. The police in *Steagald, supra,* were looking for a third party for whom they had an arrest warrant. Instead, upon entering the house, the police discovered drugs that belonged to the homeowner and promptly arrested him. The Supreme Court held that the use of the arrest warrant in this manner was reminiscent of general warrants and writs of assistance that gave the police the unfettered discretion to search anywhere and arrest anybody. No such warrant is valid. To pass constitutional muster a search warrant may permit only the search of a particular home, and not, of course, other homes. Thus, under *Steagald, supra,* this Court would exclude evidence seized in the appellant's brother's trailer only if *that brother* were the subject of the ensuing prosecution.

In *Lee v. Gilstrap*, 661 F.2d 999 (1981), our own Fourth Circuit held that a suspect "occupying" his mother-in-law's house could not protest a search that revealed him sequestered in the bathroom linen closet. The court stated, "[w]e reject Lee's arguments that the entry by the police into his mother-in-law's house and the subsequent search for him violated his constitutional rights. The rights protected by the Fourth Amendment are personal; they may not be asserted vicariously." *Id.,* at 1000.

■ The brother's trailer in this case was not searched nor entered forcibly. Clearly, the search of a residence is a considerably greater violation of the privacy interest than a mere police entry, especially when such entry is permitted by the homeowner. This Court has stated that a warrantless search or seizure is reasonable if the circumstances justifying the invasion of privacy outweigh the privacy interest infringed upon. In *State v. Peacher*, 167 W.Va. 540, 280 S.E.2d 559 (1981), where we held that an individual's expectation of privacy in his automobile is less than that in his home or his place of business, we implicitly recognized varying degrees of in-

trusiveness. A mere entry, as in Miss Schofield's case, is even less intrusive than a seizure.

■ Thus, we hold that the appellant's arrest, pursuant to an invalid arrest warrant, at the home of a third party was permissible because the arresting officers had reasonable grounds to believe that she had committed a felony. Furthermore, because the appellant's relatives were aware of the incriminating evidence that had been discovered they might well have relayed that information to her; Miss Schofield then might have fled. Indeed, as she stated at her plea-bargaining hearing: "I should have went to Canada before anyone arrested me." Since the arrest of the appellant was valid, her subsequent spontaneous statements did not warrant suppression.

## II

The appellant claims that the circuit court erred in failing properly to determine the question of appellant's competency to stand trial under all the facts and circumstances of this case. Miss Schofield maintains it was error for the circuit court not to hold a competency hearing under *W. Va. Code* 27–6A–1(d) [1983] and to fail to request a neurological examination of the appellant. We disagree.

Well before trial, Miss Schofield's counsel stated that they were unable to communicate effectively with their client. Counsel insisted that the defendant misunderstood their advice and directions and that the defendant persistently rambled in conversations with counsel. Counsel told the court that the appellant refused to discuss matters necessary to enable them adequately to prepare for trial. The trial judge accordingly ordered the appellant to be examined by experts to ascertain if she was competent to stand trial.

The initial examiners found her IQ to be below average but denied that she was mentally ill or even deficient. As a result of this first set of examinations, the trial court found Miss Schofield to be competent and notified defense counsel that they could request a hearing on the examiners'

findings under *W. Va. Code* 27–6A–2 [1979]. Such a hearing would include the right to another psychological examination by an independent expert, the right to present evidence, and the right to have counsel cross-examine the State's medical witnesses to test the basis of their opinions. For some reason that is not explained on appeal, defense counsel never asked for a hearing.

Instead, on 15 September 1982, a plea bargain hearing was undertaken to consider a guilty plea to second degree murder. The defendant, however, was unwilling to accept the plea bargain after learning that, if the case went to trial, the jury could still return a verdict of manslaughter. At this point the defense counsel filed affidavits in which they outlined their difficulties representing the appellant. Miss Schofield's lawyers were upset that their client would not stand by any one of her four stories about Mr. Gill's murder. The lawyers stated that the appellant was either unable or unwilling to understand her role at trial and that communication with her was arduous at best.

As a result of the representations, the trial court acquiesced to a second series of competency examinations. The psychological report of the Spencer State Hospital commented:

> It is felt that this young lady probably has had severe identity problems in the past, but now has made a self-identity as a murderess and this, at least to some measure, has resolved her identity conflicts.

The examiners did not find Miss Schofield to be incompetent, or mentally unable to discern the truth; it appears she was only unwilling to reveal the truth.

■ Miss Schofield would have been entitled to a neurological consultation had her counsel ever requested one. Since no examination was made, however, we apply our holding in *State v. Baker*, 169 W.Va. 357, 287 S.E.2d 497 (1982) in which we held that the failure of counsel to implement an order for a mental examination is not error where counsel failed to act to implement that order. In the appellant's case counsel

never requested a neurological examination. Nor did the defense request a competency hearing under *W.Va. Code* 27–6A–2 [1979]. Because no such requests were made the court properly entered orders on 25 August 1982 and again on 30 November 1982, that found the defendant competent to stand trial. Both orders noted that counsel could request, within a reasonable time, an evidentiary hearing on the issue of competency. The appellant's counsel persisted in their solemn silence and failed to request the hearing.

Instead, at the opening of the trial on 13 December 1982, counsel asked for the jury to make a competency determination. When asked why no request for a hearing had come earlier, counsel responded that they had preferred to wait until "the jury was here to do this." The court replied that this was an issue for the court and not the jury to decide and, accordingly, refused to bring the issue before the jury. Defense counsel demurred and stated that they were ready to proceed with the trial.

■■■■ In such circumstances it cannot be said that the trial court denied Miss Schofield the opportunity for a judicial hearing on her competency to stand trial for the murder of James Gill. A request made the day of trial is *prima facie* untimely. In *State v. Audia,* 171 W.Va. 568, 301 S.E.2d 199 (1983) this Court stated that a motion for a competency hearing made on the morning of trial came too late when the psychiatric report had been received by defense counsel ten days before trial. This accords with our holding in *State v. Church,* 168 W.Va. 408, 284 S.E.2d 897 (1981) where we opined that the defendant may request a hearing on the issue of competence at any reasonable time prior to trial. Furthermore we note the unanimity contained in Miss Schofield's psychiatric reports. As such our holding in *State v. Milam,* 159 W.Va. 691, 226 S.E.2d 433 (1976) is inapplicable. In *Milam, supra,* this Court held that a failure to grant the competency hearing was reversible error when psychiatrists reasonably differed as to the appellant's competency.

III

Two days before trial defense counsel notified the court that they were considering an insanity plea. Nothing more was heard, however, until after the appellant testified. The defense then requested a recess for additional time to consider whether they wished to present further testimony to buttress a plea of insanity. After this recess the defense reconsidered and decided not to present additional evidence on the issue of insanity. They still, however, requested insanity instructions. The court refused and stated that it could not permit the insanity issue to go to the jury without further evidence.

Miss Schofield maintains that the lower court erred by refusing to instruct the jury that she might have been insane at the time of the homicide, despite the dearth of evidence at trial and in the record that she could have been insane. At the suppression hearing, Miss Schofield's mother testified that her daughter had a poor ability to comprehend instructions; she did not maintain her daughter was insane. The only evidence presented to the jury at trial to suggest Miss Schofield was mentally unstable when she shot the victim was that she became angry during a prearrest interview after a detective advised her to consider her child and that she became hysterical when she saw her child in a detective's arms at the time of her arrest. The defendant testified that she was upset and "freaked out" when she shot Mr. Gill but she did not claim that she ever lost control or failed to understand the consequences of her actions.

■■■■ In *State v. Woods,* 169 W.Va. 767, 289 S.E.2d 500 (1982) we found that it was error to charge the jury with a theory that was unsupported by any evidence. As insanity is an affirmative defense, the burden is on the appellant to produce sufficient evidence to allow the jury to believe that there was a reasonable doubt as to the defendant's sanity, Syllabus Point 3, *State v. Daggett,* 167 W.Va. 411, 280 S.E.2d 545 (1981). Four experts in pretrial medical examinations found Miss Schofield sane. Additional competent evidence of insanity

would have been needed to shift the burden of persuasion to the state and allow the court to give an insanity instruction. But Miss Schofield relies on *State v. Wimer*, 168 W.Va. 417, 284 S.E.2d 890 (1981), where this Court held: "[T]he testimony of expert witnesses is not exclusive and the jury has the right to weigh the testimony of all witnesses, experts and otherwise." *State v. Wimer, supra*, 168 W.Va. at 428, 284 S.E.2d at 896. We have, however, reviewed the record in this case and find that no lay testimony was introduced in this case and the trial court was correct that an insanity issue was not raised.

## IV

On the fourth day of trial the appellant's counsel requested a mistrial because of two photographs that appeared in the morning and evening Parkersburg newspapers. One photograph showed Miss Schofield testifying at the in-camera voluntariness hearing with an empty jury box appearing prominently in the photograph. The second photograph showed the appellant being escorted to the courthouse by a deputy sheriff. She was not, however, handcuffed. It is the appellant's contention that these photographs were prejudicial to her. The first photograph, she contends, constituted an impermissible burden on her right to remain silent because lay jurors might wonder why she was willing to testify outside their presence but not before them. The second photograph could perhaps indicate that the appellant was so dangerous that she was refused bail and kept in custody during the trial.

On 16 December 1982 the trial court and the defense counsel questioned the jurors individually regarding the exposure to the photographs. It appears that most of the jurors had seen one or both of the photographs and that one of the newspapers appeared in the jury room the day before. Apparently, however, none of the jurors saw it. Each juror indicated to the court that he was not biased, prejudiced, or influenced in any way, by his exposure to the photographs.

After hearing arguments on the merits of granting a mistrial, the court overruled the defense's motion. The jury was returned to the courtroom and the court encouraged every juror to disqualify himself if "any of you have any doubt about your ability to render a verdict solely and exclusively on the evidence presented in the courtroom." The court assured each juror that he would not be criticized for excusing himself from the trial.

In *State v. Beck*, 167 W.Va. 830, 286 S.E.2d 234 (1981), and *State v. Neider*, 170 W.Va. 662, 295 S.E.2d 902 (1982), this Court stated that jurors who had received some knowledge of the case on which they were serving from reading newspaper articles would not automatically be disqualified unless bias or prejudice would prevent them from rendering a verdict solely on the evidence under the instructions from the court.

In this case the trial court made a finding of fact that the jurors could follow his instructions and would base their decision solely on the evidence at trial. The *voir dire* demonstrated to his satisfaction that none of the jurors drew any inferences or conclusions adverse to the defendant from the photographs. Thus this is not an instance of the court abusing its discretion since every juror on *voir dire* indicated that he could render a verdict without bias or prejudice solely on the evidence under the instructions of the court. *See Syl. Pt.* 5, *State v. Beckett*, 172 W.Va. 817, 310 S.E.2d 883 (1983); *Syl.Pt.* 6, *State v. Gum*, 172 W.Va. 534, 309 S.E.2d 32 (1983).

## V

Finally, the appellant assigns as error that the *West Virginia* and *United States Constitutions* were violated by the court's instructions to the jury regarding a recommendation of mercy. The court instructed the jury as follows:

Should you find the Defendant *guilty of first degree murder without recommendation of mercy, she will be sentenced to prison for life.* Should you find the defendant guilty of first degree murder with a recommendation of mercy, she must serve ten years in prison before she first becomes eligible for parole, which may or may not be awarded then or at a

later date by the State Board of Parole. The Board of Parole makes its decision based upon an investigation of the Defendant's complete criminal record, her prison record, including a report on conduct, work and attitude in prison and complete physical, mental, and psychological examinations conducted within two months preceding the evaluation. [emphasis added by this Court].

Miss Schofield contends that this instruction did not make it absolutely clear to the jury that "prison for life" foreclosed the possibility of parole at any time. Miss Schofield insists that the jury could well have inferred, or believed, that she would be eligible for parole at sometime later than ten years after her initial incarceration. Accordingly, she contends that her sentence without mercy must be stricken as unconstitutional under the recent Supreme Court case of *Solen v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983).

In *Solen v. Helm, supra,* the Supreme Court struck down a sentence of "life without" that had been imposed upon a defendant for his seventh non-violent felony conviction that made him an habitual offender. The Court held that the sentence was disproportionate to the offense and stated that a sentence of "life without" was qualitatively different from a sentence of life with a possibility of parole and thus subject to close scrutiny on review because such a sentence rejects rehabilitation as a goal of the criminal justice system. The appellant argues that *Solen, supra,* gives special constitutional status to "life without" sentences much as *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) gave special status to death sentences.

■ But in fact this discussion is unwarranted here. Although the appellant complains of the failure to instruct the jury with guidelines, no instructions were ever requested or offered. Nor are they mandated by statute. Under Rule 30, *W.Va. R.Crim.P.* 30 an alleged error must be raised in the trial court to be considered on appeal and unless a particular instruction is fundamental to a defendant's theory of the case, the trial court is not required to act *sua sponte. See State v. Butcher*, 165 W.Va. 522, 270 S.E.2d 156 (1980). Had the defendant requested another instruction it might have been error for the court not to have offered it.

■ In *State v. Wayne*, 162 W.Va. 41, 245 S.E.2d 838 (1978), this Court stated: "In a case in which a jury may return a verdict of first degree murder, the defendant is entitled to any instruction on the interrelationship between a recommendation of mercy and parole which correctly states the law; ..." *Supra*, at Syllabus Point 4. The instruction that was given by the court was a correct statement of law; ..." *Supra*, at Syllabus Point 4. The instruction that was given by the court was a correct statement of law; it was not misleading nor was it plain error to give it. The well settled rule in criminal cases that if a party fails to offer an instruction regarding a particular point of law upon which she relies, she cannot later complain of the absence of that instruction unless the error was so plain and the result so outrageous that the trial court ought to have intervened to do substantial justice. *See, e.g.* Syl.Pt. 3, *State v. Evans*, 172 W.Va. 810, 310 S.E.2d 877 (1983); Syl.Pt. 13, *State v. Gum*, 172 W.Va. 534, 309 S.E.2d 32 (1983).[1]

This Court has determined that the conviction and sentence of Miss Kathy Jo Schofield should stand intact and, accordingly, the judgment of the Circuit Court of Wood County is affirmed and the writ of habeas corpus heretofore granted is discharged.

No. 16245—Affirmed.

No. 16389—Writ Denied.

1. This Court rejects the appellant's request that the "cumulative error doctrine" be applied in this case. The assignments of error neither individually nor cumulatively were such as to prevent Miss Schofield from receiving a fair trial. See Syl.Pt. 8, *State v. Hall,* 172 W.Va. 138, 304 S.E.2d 43 (1983).

McGRAW, Justice, dissenting:

The majority's conclusion that because the appellant "was not arrested in her own home, the strictures of the Supreme Court requiring a valid warrant absent exigent circumstances *to arrest a person in his own home are inapplicable,*" maj. op. at 105, directly conflicts with pertinent authority.

The majority's reliance on *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) is misplaced. In *Payton,* the United States Supreme Court, exhibiting considerably more restraint than does the majority, was careful to note that, "[T]hese cases [do not] raise any question concerning the authority of police, without either a search or arrest warrant, to enter a third party's home to arrest a suspect." 445 U.S. at 583, 100 S.Ct. at 1378, 63 L.Ed.2d at 649. Further, in rejecting an assertion that only a search warrant based on probable cause to believe a suspect is at home can adequately protect the privacy interests at stake despite the existence of an arrest warrant for that suspect, the Court observed:

> If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open *his* doors to the officers of the law. Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling *in which the suspect lives* when there is reason to believe the suspect is within.

445 U.S. at 602–03, 100 S.Ct. at 1388–89, 63 L.Ed.2d at 660–61 (Emphasis added). It seems that the majority is not satisfied with raising issues it "need not reach," as with its inexplicable analysis of the "good faith" exception to the exclusionary rule, maj. op. at 104, it further attributes to the United States Supreme Court in *Payton* the adjudication of issues expressly not addressed.

The majority further runs roughshod over the reasonable expectation of privacy analysis articulated by the United States

Supreme Court in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Unquestionably, as the United States Supreme Court stated in *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734, 739 (1961), "At the very core [of the fourth amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." The majority's exclusive emphasis, however, on the "home" harkens back to the overly simplistic concept of "a constitutionally protected area" expressly discarded by the Court in *Katz,* 389 U.S. at 350, 88 S.Ct. at 510, 19 L.Ed.2d at 581. At the core of *Katz* is the Court's holding that, "[T]he Fourth Amendment protects people, not places." 389 U.S. at 351, 88 S.Ct. at 511, 19 L.Ed.2d at 582. Accordingly, following *Katz,* the key to an analysis of the existence of full fourth amendment protection is "first, that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" 389 U.S. at 361, 88 S.Ct. at 516, 19 L.Ed.2d at 588 (Harlan, J., concurring). The majority's attempt at misdirecting attention toward the brother's privacy interests notwithstanding, it is abundantly clear that, under *Katz,* the appellant had a reasonable expectation of privacy of her own in her brother's home. For example, this Court, in *State v. McNeal,* 162 W.Va. 550, 251 S.E.2d 484, 488–89 (1978), expressly extended the exigent circumstances requirement to a relative's home in a case involving an illegal search and seizure in the home of McNeal's cousin.

The majority's cavalier consideration of the United States Supreme Court's opinion in *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) ignores its constitutional underpinnings. Without question, *Steagald* involved a question of a third party's constitutional rights. The rationale for the Court's decision, however, is much broader, indicating that, in the absence of exigent circumstances or consent, a search warrant must be obtained for the subject of an arrest warrant who is reason-

ably believed to be within the home of a third party:

In the absence of exigent circumstances, we have consistently held that such judicial untested determinations are not reliable enough to justify an entry into a person's home to arrest him without a warrant, or a search of a home for objects in the absence of a search warrant. ... We see no reason to depart from this settled course when the search of a home is for a person rather than an object. A contrary conclusion—that the police, acting alone and in the absence of exigent circumstances, may decide when there is sufficient justification for searching the home of a third party for the subject of an arrest warrant—would create a significant potential for abuse. Armed solely with an arrest warrant for a single person, the police could search all the homes of that individual's friends and acquaintances. See, e.g., *Lankford v. Gelston,* 364 F.2d 197 (CA 4 1966) (enjoining police practice under which 300 homes were searched pursuant to arrest warrants for two fugitives). Moreover, an arrest warrant may serve as the pretext for entering a home in which the police have a suspicion, but not probable cause to believe, that illegal activity is taking place. Cf. *Chimel v. California,* 395 U.S. 752, 767, 89 S.Ct. 2034, 2042, 23 L.Ed.2d 685, 696 (1969).

451 U.S. at 213–15, 101 S.Ct. at 1648–49, 68 L.Ed.2d at 46–47. Therefore, under *Steagald,* a separate search warrant should have been obtained for the appellant when the police had reasonable grounds to believe that she was at her brother's home.

Because I believe that the United States Supreme Court would reverse the appellant's conviction based upon the admission of her confession obtained pursuant to an illegal arrest, I respectfully dissent.