# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## September 2016 Term

No. 15-0581

FILED

**October 6, 2016**

released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**STATE OF WEST VIRGINIA,**
**Plaintiff Below, Respondent,**

**V.**

**ALVARO A. VILELA,**
**Defendant Below, Petitioner.**

---

**Appeal from the Circuit Court of Berkeley County**
**Honorable Gray Silver, III, Judge**
**Criminal Action No. 14-F-123**
**AFFIRMED**

---

**Submitted:  September 20, 2016**
**Filed:  October 6, 2016**

B. Craig Manford
Martinsburg, West Virginia
Attorney for the Petitioner

Christopher C. Quasebarth
Chief Deputy Prosecuting Attorney
Benjamin Hiller
Assistant Prosecuting Attorney
Martinsburg, West Virginia
Attorneys for the Respondent

**JUSTICE DAVIS delivered the Opinion of the Court.**

**SYLLABUS BY THE COURT**

1.  "In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review." Syllabus point 3, *State v. Vance*, 207 W. Va. 640, 535 S.E.2d 484 (2000).

2.  "This Court is constitutionally obligated to give plenary, independent, and *de novo* review to the ultimate question of whether a particular confession is voluntary and whether the lower court applied the correct legal standard in making its determination. The holdings of prior West Virginia cases suggesting deference in this area continue, but that deference is limited to factual findings as opposed to legal conclusions." Syllabus point 2, *State v. Farley*, 192 W. Va. 247, 452 S.E.2d 50 (1994).

3.  "If after requesting counsel an accused shall recant his request, there is a heavy burden upon the state to prove his waiver of right to counsel." Syllabus point 2, *State v. Bradley*, 163 W. Va. 148, 255 S.E.2d 356 (1979).

4.      "The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syllabus point 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

5.      "A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled." Syllabus point 3, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

6.     "'"Upon motion [for judgment of acquittal], the evidence is to be viewed in the light most favorable to [the] prosecution.  It is not necessary in appraising its sufficiency that the trial court or reviewing court be convinced beyond a reasonable doubt of the guilt of the defendant; the question is whether there is substantial evidence upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt." *State v. West*, 153 W. Va. 325, 168 S.E.2d 716 (1969).'  Syl. pt. 1, *State v. Fischer*, 158 W. Va. 72, 211 S.E.2d 666 (1974)."  Syllabus point 5, *State v. Grimes*, 226 W. Va. 411, 701 S.E.2d 449 (2009).

7.     "Once a suspect in custody has expressed his clear, unequivocal desire to be represented by counsel, the police must deal with him as if he is thus represented. Thereafter, it is improper for the police to initiate any communication with the suspect other than through his legal representative, even for the limited purpose of seeking to persuade him to reconsider his decision on the presence of counsel."  Syllabus point 1, *State v. McNeal*, 162 W. Va. 550, 251 S.E.2d 484 (1978).

8.     "For a recantation of a request for counsel to be effective: (1) the accused must initiate a conversation; and (2) must knowingly and intelligently, under the totality of the circumstances, waive his right to counsel."  Syllabus point 1, *State v. Crouch*, 178 W. Va. 221, 358 S.E.2d 782 (1987).

**Davis, Justice:**

Petitioner, Alvaro A. Vilela ("Mr. Vilela"), was convicted in the Circuit Court of Berkeley County of the felony offense of kidnaping,[1] with a recommendation of mercy, and of attempted extortion,[2] a misdemeanor. The jury acquitted Mr. Vilela of the felonies of assault during the commission of a felony[3] and extortion.[4] Additionally, the jury acquitted Mr. Vilela of fifteen misdemeanor counts of unlawful use of a credit card.[5] Mr. Vilela was sentenced to life imprisonment on the kidnaping conviction, with parole eligibility in ten years. He was also sentenced to one year in jail on the conviction of attempted extortion, which is to be served prior to the consecutively run life sentence.

On appeal, Mr. Vilela raises two assignments of error. First, he alleges that the trial court erred by allowing into evidence the entirety of his audio recorded statement, a portion of which contained statements he made after unequivocally invoking his right to counsel. Second, Mr. Vilela alleges that the trial court erred in failing to grant his motions

---

[1]W. Va. Code § 61-2-14(a) (2012) (Repl. Vol. 2014).

[2]*Id*. § 61-2-13 (1923) (Repl. Vol. 2014).

[3]*Id*. § 61-2-10.

[4]*Id*. § 61-2-13.

[5]*Id*. 61-3-24a(b)(1) (1994) (Repl. Vol. 2014).

1

for acquittal at the close of the State's case-in-chief and at the close of all the evidence, or in the alternative, the verdict was contrary to the evidence presented.

Upon thorough and careful review of the record, the parties' briefs and arguments, and the applicable law, we affirm.

# I.

## FACTUAL AND PROCEDURAL HISTORY

### A. *Facts Giving Rise to Kidnaping Charge*

At the outset, we observe that Mr. Vilela set forth a full, fair and comprehensive summary of the testimony and facts established at the pre-trial suppression hearing and at trial. Indeed, the State indicated that Mr. Vilela accurately summarized the facts of the case. Due to the nature of the recantation issue involved in the request for counsel during custodial questioning and the claims of insufficient evidence, we provide a thorough review of the evidence.

On January 24, 2014, Trooper C.J. Hill of the West Virginia State Police received a report regarding the possible disappearance of Ms. Carol Dyall, who was seventy-five years old. The report came from Ms. Bronwin Porter, a friend of Ms. Dyall. According to Ms. Porter, she and other friends of Ms. Dyall had been unable to contact Ms. Dyall for

2

several days. The lack of contact was reported to be highly unusual. Concern also was expressed by Ms. Porter because Ms. Dyall had missed an important dinner meeting with her financial advisors. In follow-up to the missing person report, Trooper Hill went to the home of Ms. Dyall, which appeared to be secured. Trooper Hill also contacted other friends of Ms. Dyall who were similarly concerned. The friends mentioned that they also had concerns regarding a male friend of Ms. Dyall's who was reported to be French with a temper. The friend was later identified as fifty-year-old Mr. Vilela.

Trooper Hill contacted the service provider for Ms. Dyall's cellular phone. A "ping" was performed on the cellular phone which showed it to be in the vicinity of Avery and High Streets in Martinsburg, West Virginia. A call log of Ms. Dyall's phone allowed for Trooper Hill to begin calling the list of numbers. Those phone calls revealed that Ms. Dyall had missed a dentist appointment and a hair appointment, which was reportedly uncharacteristic. Trooper Hill also contacted Ms. Dyall's financial advisors to alert them that she appeared to be missing.

Trooper Hill learned that Ms. Dyall made brief and odd contact with several of her friends via voicemail and email. Significantly, Trooper Hill received a phone call from Ms. Dyall indicating she was fine and staying with a friend in Maryland. When the call terminated abruptly, Trooper Hill attempted to call back without success. However, Trooper

3

Hill was able to identify the phone number of the phone used by Ms. Dyall. A "ping" performed on the phone indicated that it was located in Martinsburg, West Virginia. A call log for the newly discovered number was used to begin calling phone numbers and further investigating. A name and address were obtained from a dentist's office that had attempted to contact a patient at that phone number when an appointment was missed. The patient's name was Alvaro Arthur Vilela with a street address in Martinsburg.

At about the same time, Trooper Hill received a call from Mr. Jeff Krinsky, who was one of Ms. Dyall's financial advisors. Mr. Krinsky reported that Ms. Dyall had called requesting that her accounts be closed and all her moneys transferred to her. Mr. Krinsky stalled by informing Ms. Dyall that forms and paperwork would have to be completed in order to accomplish the transaction.

A trooper and local law enforcement officers were dispatched to the Martinsburg address that had been obtained during the investigation. Upon arrival at the location, which was a residence, entry was not immediately granted as Mr. Vilela had to use power tools to remove screws securing the doors. Upon entry, the officers encountered Ms. Dyall sitting in the kitchen. Ms. Dyall mouthed to the officers a request for assistance. Mr. Vilela was arrested, and an ambulance was called for Ms. Dyall. She was transported to the

4

Berkeley Medical Center. There, she was treated for a broken arm and other injuries. Photographs were taken of her badly bruised body.

After Mr. Vilela's arrest, he was placed in a trooper's cruiser where he gave a recorded statement to Trooper Hill. The facts and circumstances of the statement will be discussed in some detail below.

### B. The Motion to Suppress Mr. Vilela's Statement

On January 9, 2015, a pretrial hearing was held on the motion to suppress Mr. Vilela's statement made during custodial interrogation. The State presented the testimony of Trooper Hill. According to Trooper Hill, he took a statement from Mr. Vilela while Mr. Vilela was handcuffed, in custody, and under arrest sitting behind the wire cage in the back of another trooper's cruiser. Mr. Vilela agreed to speak with Trooper Hill. The entire conversation, including the introduction between Trooper Hill and Mr. Vilela, was audio recorded. The audio recording was played in its entirety during the pretrial hearing.

Trooper Hill described Mr. Vilela's demeanor during the interrogation as calm with no apparent distress or anxiousness. Mr. Vilela was appropriately dressed, and the

5

heater in the cruiser was operating. Trooper Hill read Mr. Vilela his *Miranda*[6] rights.  Mr. Vilela stated that he understood his right to remain silent and his right to have an attorney present.  Indeed, counsel for Mr. Vilela remarked at the pretrial hearing that there was no evidence that Mr. Vilela was under the influence of drugs or alcohol, or any indication that he could not comprehend the rights that were explained to him.  Counsel further commented that the audio tape and transcript indicated that Mr. Vilela understood what took place.

The recorded interrogation establishes that Mr. Vilela explained that he met Ms. Dyall a few years earlier and began working at her house refinishing the floors, remodeling rooms, and painting.  He stated that he lived in her home some two years while doing the work and that he and Ms. Dyall had previously had a sexual relationship.  Mr. Vilela claimed the two were friends and it was in that capacity that he picked her up on January 19, 2014, and took her to his house where they had been talking as good friends.

In response to questioning about possible injuries sustained by Ms. Dyall, Mr. Vilela remarked that she had fallen in the snow at her home.  He stated that she had some marks on her leg as a result of the fall.

---

[6]*Miranda v. Arizona*, 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), stands for the fundamental constitutionally derived principle that, prior to a custodial interrogation, a defendant must be advised that he has the right to remain silent and that he has a right to an attorney.

6

Trooper Hill again informed Mr. Vilela that he did not have to talk. He further informed Mr. Vilela that Ms. Dyall reported she had been kidnaped by Mr. Vilela and that he also had attempted to gain her financial assets. Mr. Vilela represented that Ms. Dyall was trying to help him get back to France. Mr. Vilela informed Trooper Hill that Ms. Dyall had a "wrong" in her past in that she had poisoned and killed a man in San Francisco years earlier. He stated that he had a video on his iPhone under his mattress recording Ms. Dyall confessing to the poisoning, which had been done some thirty years earlier. Mr. Vilela told Trooper Hill that he prays to God, has the Holy Spirit in him, and the wrongful acts of Ms. Dyall had been revealed to him by the Holy Spirit. He stated that Ms. Dyall was astonished and surprised that he knew she had killed a man. Mr. Vilela proceeded to claim that the Holy Spirit revealed that Mr. Vilela himself had previously been poisoned by Ms. Dyall.

In continuing his statement to Trooper Hill, Mr. Vilela explained that he told Ms. Dyall she needed to pay a price for what she had done and that he had been sent to help her. The price to be paid for poisoning the San Francisco man was that of sending Mr. Vilela back to his children in France. When asked by Trooper Hill how much money he had requested from Ms. Dyall in order to return to France, Mr. Vilela responded that he sought around $400,000.00. Upon further questioning by Trooper Hill, the following exchange then took place:

> Trooper Hill ("Hill"): So you wanted around $400,000.00 . . .
> to go back to France; is that correct?

7

Arthur Vilela ("A.V."): I just told you.

Hill: Is that correct? It is a yes or no.

A.V.: Can I have a lawyer, please?

Hill: You want a lawyer? Yes, you may. I appreciate you talking and being a man about it–

At this point on the audio recording, some sort of noise can be heard. Trooper Hill testified that the noise was that of him moving about in order to exit the vehicle. Then, in the absence of any questioning by Trooper Hill, Mr. Vilela, of his own accord, initiated further discussion as follows:

A.V.: You have to go get my iPhone, please.

Hill: Your iPhone?

A.V. Yes. It is inside under my mattress.

Hill: Well, hold on. Let me stop you. Let me stop you. You said you wanted a lawyer. If you want a lawyer then I'm not going to go do this stuff. I'm going to stop talking to you. You and I aren't going to talk anymore. Do you want to talk with me and have me continue to do this or do you want me to get you a lawyer? It's up to you. Do you want to talk to me and have me go up there and deal with this iPhone and continue to listen to your story or do you want your lawyer and you can do everything through him?

A.V.: Whatever is easy for me.

Hill: Partner, I can't tell you what to do. You're an adult, you have to make this decision yourself. We can continue to converse like gentlemen or you can converse with an attorney.

8

A.V.: I'm going to be in jail forever.

Hill: I don't know that. I'm not a judge. I don't know what your fate is. I don't know what happens from here to you. All I can do is try to make sense of how all this happened. Now, if you want your story to be told of how all this happened and you want to be up front and honest then I'm your guy. If you want to try to sweep stuff under the rug you can do that too and I can get up and leave this car.

A.V.: I told you already what I have to tell you.

Hill: Okay. Can I ask you some questions or do you want an attorney?

A.V.: Go ahead.

What followed Mr. Vilela's response that Trooper Hill could "[g]o ahead" and proceed with questioning was a brief reiteration of the statements made by Mr. Vilela prior to his request for an attorney. Mr. Vilela stated that Ms. Dyall voluntarily wanted to give him money because she felt guilty for killing the man in San Francisco. He denied forcing or physically harming Ms. Dyall. Mr. Vilela stated that Ms. Dyall was transferring her money to him of her own free will because she had killed a man. He proceeded to state that it was all documented in a video confession of Ms. Dyall taken a few days earlier with his iPhone. When Trooper Hill asked if Mr. Vilela had any problem with him watching the video, Mr. Vilela responded that he would like Trooper Hill to watch it. At the conclusion of the statement, Trooper Hill asked whether the statement was voluntary and without coercion.

9

In response, Mr. Vilela stated: "[w]ell, there's always a little psychological pressure from you, of course . . . have to be honest, right?"

Upon cross-examination by Mr. Vilela's attorney, Trooper Hill agreed that it appeared that getting the iPhone was important to Mr. Vilela. Trooper Hill denied any intent to induce Mr. Vilela to change his mind about wanting a lawyer by saying that he was not going to get the cell phone; rather, Trooper Hill testified that he meant to confirm that talking would stop if a lawyer was requested.

On January 20, 2015, the trial court entered an order holding that the statement of Mr. Vilela was freely and voluntarily given following *Miranda* warnings. The trial court further found that Mr. Vilela invoked his right to counsel, but clearly recanted the request for counsel when he initiated further conversation with Trooper Hill and told him to "go ahead" with questioning. Thus, the trial court determined that the statement was admissible in its entirety. During the course of the trial, the audio recording was played in its entirety, and the jury was provided a demonstrative transcript of the recording in order to follow along. The objections of Mr. Vilela to that portion of the statement subsequent to the request for an attorney were preserved.

## C. Trial Testimony

As we proceed to discuss trial testimony, we observe that Mr. Vilela elected to go to trial while foregoing a competency evaluation. A comprehensive voir dire of Mr. Vilela was conducted. The trial court found that Mr. Vilela knowingly and voluntarily waived his competency evaluation and competency defense. On appeal, Mr. Vilela does not challenge his competency.

At trial, Ms. Porter testified about her unusual and troubling inability to contact Ms. Dyall by phone, text, or email, beginning on January 20, 2014. When Ms. Dyall did not show up for a dinner meeting, Ms. Porter became alarmed and contacted police. She also contacted Ms. Dyall's financial advisors.

Mr. Jeff Krinsky, one of Ms. Dyall's financial advisors, testified that Ms. Dyall was a good saver and conservative investor who had been his client some fifteen years. Once he was alerted there may be a problem, Mr. Krinsky placed a security lock on Ms. Dyall's accounts. He further testified that he received an uncharacteristic call from Ms. Dyall requesting that her money immediately be wired to a bank in West Virginia. He believed she was under duress and indicated that both the request and Ms. Dyall's demeanor were abnormal. He advised her that there were procedures and paperwork to be followed; she then

11

stated she would get back to him.  Upon conclusion of the call, Mr. Krinsky immediately contacted Trooper Hill.

Ms. Robin Benjamin, of another financial institution, testified that Ms. Dyall was a long-term client.  Ms. Benjamin testified that she was contacted by Ms. Porter, who was concerned about Ms. Dyall.  Ms. Dyall also missed an investment dinner meeting.  Like Mr. Krinsky, Ms. Benjamin placed Ms. Dyall's account on a fraud alert.  When Ms. Dyall called asking to speak to a supervisor who was not present, Ms. Benjamin obtained the phone number for the phone Ms. Dyall used by relying on caller identification and turned the number over to law enforcement.

Ms. Dyall testified at length regarding her relationship with Mr. Vilela and to the circumstances of the ten days she spent as a hostage.  Ms. Dyall is a former flight attendant who retired in 2009.  She resided at her Harper's Ferry, West Virginia, residence some twenty-five years.

According to her testimony, Ms. Dyall met Mr. Vilela at the hair salon where she had her hair styled.  He began styling her hair.  Mr. Vilela changed salons several times, and Ms. Dyall followed him to other salons.  At some point, she mentioned to him that she was preparing to have remodeling work done on her home.  Mr. Vilela informed her that he

12

did that type of work and that he bought, refinished, and sold homes. The two arranged for Mr. Vilela to come to Ms. Dyall's home to determine whether it was a job he could perform. After looking at the house and agreeing on a price, Mr. Vilela completed a floor refinishing project. Other projects on the house followed.

Ultimately, Mr. Vilela moved into a guest room in December of 2010 so as to continue the remodeling work. A romantic relationship developed for a period of time. Mr. Vilela's behavior began to change and become erratic. Ms. Dyall testified regarding incidents of Mr. Vilela yelling and screaming and then becoming calm and normal. In October 2012, Mr. Vilela approached Ms. Dyall and told her that God had sent him to take care of her and that she needed to confess that she poisoned a man and stole his money. Mr. Vilela began frantically pacing and talking to himself. Ms. Dyall was so frightened by his behavior that she left her home and went to stay at the home of Ms. Porter for two days. When Ms. Dyall returned to her home, Mr. Vilela left. He came back to the home on a couple occasions in order to complete a bathroom project.

After Mr. Vilela finished the bathroom project in October 2012, Ms. Dyall did not see him again until January 17, 2014, when she encountered him while at a grocery store. He asked to walk her to her car, told her about his new house, and showed her his new car. Thereafter, she received an e-mail from Mr. Vilela stating that he thought she seemed very

13

afraid of him and he wanted to assure her that he would not hurt her and that, if harming her was his intent, there had been plenty of opportunities in the past for him to kill her.

On January 19, 2014, Ms. Dyall was in her living room watching television when she heard an odd noise on her front balcony. She walked to the door and saw a long piece of wood. She opened the door, and Mr. Vilela jumped out, pushed her to the floor of her living room, and began screaming that she was a murderer who poisoned a man and stole his money. According to her testimony, Mr. Vilela was screaming and beating her with the piece of wood. Mr. Vilela then taped her ankles, hands and mouth. He took her car keys, pulled her car out of the garage, put his car in the garage, and put her in the trunk area of her car. She laid in the car for some time before he drove her away. They drove to a bank ATM machine where Mr. Vilela demanded her ATM card, but Ms. Dyall did not have an ATM card. They drove on, stopping several other places before arriving at a house where she was wrapped in a blanket and carried to an attic. She remained in the house for ten days. Ms. Dyall testified in great detail about the conditions of her confinement, much of which was spent isolated and restrained in the attic.

During Ms. Dyall's imprisonment, Mr. Vilela threatened to wrap her in saran wrap so that she would smother to death, and also threatened her with a club, to coerce her into confessing that she killed a man in San Francisco by poisoning him. He brought pen and

14

paper for her to write her confession. Mr. Vilela also accused her of casting voodoo spells on him and of attempting to poison him. Mr. Vilela required her to repeatedly write confessions with more and more detail regarding the poisoning and killing. Ultimately, Mr. Vilela videotaped her confession on an iPhone. She made up the story based on partial truths to satisfy him in her effort to survive. The video recording of Ms. Dyall was admitted into evidence and played for the jury. In the video, Mr. Vilela asks questions as prompts for details from Ms. Dyall.

Mr. Vilela had obtained Ms. Dyall's desktop computer, iPad, and financial documents. During the course of her restraint in the house, Mr. Vilela required Ms. Dyall to send an e-mail to a friend in response to an e-mail expressing concern regarding her whereabouts and well-being. He instructed her to tell the friend that she was fine and was helping friends in Maryland who had a daughter with cancer. He also directed her to use his cell phone to make a call to Ms. Porter. Ms. Dyall left a message on Ms. Porter's phone to the effect that she was fine and with friends in Maryland. Finally, Ms. Dyall was forced to call Trooper Hill and explain that she was fine and staying in Maryland with friends.

On the last day of her captivity, Ms. Dyall was brought downstairs by Mr. Vilela and instructed to call her financial agents, tell them she was buying a new house, and request that all her money be sent to her. Throughout the ordeal, Mr. Vilela claimed that

15

he needed money to get back to France and to pay back child support he owed there.  He blamed her for being in the United States as it had been his mission to help her pay her debt for poisoning the man in San Francisco.  Mr. Vilela stated that God told him to accept money as payment for her debt.  At one point, Mr. Vilela put his hands on Ms. Dyall in a ritualistic fashion and prayed for several hours for her to be forgiven for the things she had done.

Shortly after Ms. Dyall's coerced phone calls to her financial advisors, the police arrived at Mr. Vilela's residence.  As previously noted, Ms. Dyall was transported by ambulance to the hospital.  She was diagnosed with a fractured arm that required surgery and metal plates to repair.  She had bruises and abrasions up and down her body, arms, and legs.  We observe that photographs of Ms. Dyall's injuries were taken by a trooper while Ms. Dyall was hospitalized.  The photographs were admitted into evidence.  Evidence establishing that Mr. Vilela made various unauthorized charges on Ms. Dyall's credit cards also was admitted.

Senior Trooper D. W. Satterfield of the Martinsburg, West Virginia, detachment of the West Virginia State Police testified as to his involvement with the investigation of Ms. Dyall as a possible missing person.  Trooper Satterfield was contacted by Trooper Hill and asked to go to a residence and check on the welfare of Ms. Dyall.  Trooper Satterfield, accompanied by two city police officers, went to the location and knocked on the door.  He could see through a window that a woman, later determined to be

16

Ms. Dyall, was sitting at a table and a man, Mr. Vilela, was walking toward the door. Trooper Satterfield then heard the sound of a power drill. Upon entering the home, Trooper Hill saw that the door had been screwed shut with three-to four-inch long carpentry screws and could be opened only by using the power drill.

Trooper Satterfield testified that Ms. Dyall was mouthing the words "help me" to him as he was speaking to Mr. Vilela. He asked Mr. Vilela to get his identification and proceeded to speak to Ms. Dyall while one of the city officers accompanied Mr. Vilela to the porch. According to Trooper Satterfield, Ms. Dyall was "visibly shaken up" and had such bad bruising to one of her arms that he could see it from across the room. He also saw abrasions on her wrists and ankles. Ms. Dyall repeatedly told him that Mr. Vilela was going to kill her. Trooper Satterfield instructed one of the city officers to place Mr. Vilela in handcuffs and take him to a cruiser while the residence was being secured. The house was then secured and Trooper Satterfield observed that all the windows in the home were screwed shut, as was the back door of the main floor. There was a room with a mattress and cords where it appeared to Trooper Satterfield that an individual had been held. Trooper Satterfield also observed a large industrial-type roll of plastic or saran wrap. Trooper Satterfield made a request for medics due to the severe bruising, the abrasions and the fact that Ms. Dyall was older. He also requested that Trooper Hill respond to the scene.

Mr. Vilela testified on his own behalf. In many significant respects, his testimony tracks that of Ms. Dyall. He testified regarding meeting Ms. Dyall, becoming her hair stylist, refinishing her floors and doing additional renovations to Ms. Dyall's home. He testified as to the circumstances of moving into Ms. Dyall's guest bedroom so as to complete additional remodeling. He stayed in the home doing work for which he was paid and without paying rent for approximately two years. For a period of time during the two years, there was an intimate relationship between Mr. Vilela and Ms. Dyall.

Mr. Vilela further testified that the reason for his moving from Ms. Dyall's home in October 2012 was his suspicion that she had poisoned him. According to Mr. Vilela, Ms. Dyall cooked him a very hot and spicy meal, after which he became sick with vomiting, heart pounding, and problems breathing. In the morning, he confronted her with his Holy Spirit feeling in his gut that she poisoned him just as she had the man in San Francisco. He claimed that God revealed to him that Ms. Dyall had poisoned that man. When he told her his revelation, Ms Dyall appeared scared. She denied the accusation, and he began praying for her. She ran away and was gone for three days. When she returned, Mr. Vilela moved out. Like Ms. Dyall, he testified that he next saw her at a grocery store on January 17, 2014. Small talk was exchanged between the two.

18

Mr. Vilela testified that he went uninvited to Ms. Dyall's house on January 19, 2014, because he had become concerned about her soul and wanted to make her come to God, convince her to confess what she did, and take the weight of her actions from her. He denied hitting her with a stick, instead telling the jury that she injured herself resulting in bruising when she got scared as he was trying to get her to God. According to Mr. Vilela, Ms. Dyall was injured when she rushed to the basement stairs and fell down them. She declined his offer to go to the hospital. He then informed the jury that Ms. Dyall voluntarily decided to go to his house. He denied threatening or forcing her in any way.

Mr. Vilela continued to testify that, because he believed the process of Ms. Dyall confessing what she had done would take more than one evening, they packed some clothes and her computer to watch movies. He claimed that it was Ms. Dyall's choice to take her car and to sit unrestrained in the back. By way of explaining her extensive injuries, he told the jury she fell again in the snow as she was going to the car. Mr. Vilela denied that there was tape on her hands, ankles, or mouth. En route, he stopped at the bank because he thought she might need money, but she did not have an ATM card. He further stated that, when they arrived at his house, he did not carry her in covered with blankets. He denied locking her in a room or leaving her in a room while bound or restrained.

19

The testimony of Mr. Vilela continued with him telling the jury that, during Ms. Dyall's stay, he prayed for her, during which she was very receptive and emotional. He explained that they shared a connection, and held hands while he sang hymns. He had Ms. Dyall write out confessions, but denied coercing her. He wanted her to confess because he was caring for her soul. He had her write the confession down, and he videotaped it as proof to protect himself because of her bruises. Subsequently, they were getting along well, and she decided to stay more days with him.

Mr. Vilela told the jury that Ms. Dyall had attempted to murder him in the same manner she had killed the other man. He stated that he did not take any money from Ms. Dyall, and that she consented to his use of her credit cards to purchase food for both of them.

On cross and re-cross-examination, Mr. Vilela admitted to owing a large amount of child support in France. He conceded that, when he was sick from what he believed was an attempt to poison him, he did not seek medical attention and did not contact law enforcement. He further agreed that, on the night of January 19, 2014, he showed up at Ms. Dyall's home uninvited and unannounced after not seeing her, except at the grocery store, for more than 14 months. He contended that Ms. Dyall offered to help him financially after her confession. Mr. Vilela admitted that his financial circumstances from January 17, 2014, through the time that Ms. Dyall was at his house were desperate.

20

Mr. Vilela unsuccessfully moved for a judgment of acquittal pursuant to Rule 29 of the West Virginia Rules of Criminal Procedure at the close of the State's case-in-chief, upon the conclusion of all the evidence and subsequent to the jury verdict. This appeal followed.

## II.

## STANDARD OF REVIEW

Generally, this Court's standard governing appeal in criminal cases is:

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syl. pt. 3, *State v. Vance*, 207 W. Va. 640, 535 S.E.2d 484 (2000).

Because Mr. Vilela challenges the trial court's ruling on the admissibility and voluntariness of his confession, we note this Court has long held:

> This Court is constitutionally obligated to give plenary, independent, and *de novo* review to the ultimate question of whether a particular confession is voluntary and whether the lower court applied the correct legal standard in making its determination. The holdings of prior West Virginia cases suggesting deference in this area continue, but that deference is limited to factual findings as opposed to legal conclusions.

Syl. pt. 2, *State v. Farley*, 192 W. Va. 247, 452 S.E.2d 50 (1994).

21

It is also settled law that, "[i]f after requesting counsel an accused shall recant his request, there is a heavy burden upon the state to prove his waiver of right to counsel." Syl. pt. 2, *State v. Bradley*, 163 W. Va. 148, 255 S.E.2d 356 (1979).

With respect to Mr. Vilela's contention that the circuit court erred by denying his motion for judgment of acquittal made pursuant to Rule 29 of the West Virginia Rules of Criminal Procedure, our standard of review is firmly established. "The Court applies a de novo standard of review to the denial of a motion for judgment of acquittal based upon the sufficiency of the evidence." *State v. Juntilla*, 227 W. Va. 492, 497, 711 S.E.2d 562, 567 (2011) (per curiam) (citing *State v. LaRock*, 196 W. Va. 294, 304, 470 S.E.2d 613, 623 (1996)). Moreover,

> "'[u]pon motion [for judgment of acquittal], the evidence is to be viewed in the light most favorable to [the] prosecution. It is not necessary in appraising its sufficiency that the trial court or reviewing court be convinced beyond a reasonable doubt of the guilt of the defendant; the question is whether there is substantial evidence upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt.' *State v. West*, 153 W. Va. 325[,168 S.E.2d 716] (1969)." Syl. pt. 1, *State v. Fischer*, 158 W. Va. 72, 211 S.E.2d 666 (1974).

Syl. pt. 5, State v. *Grimes*, 226 W. Va. 411, 701 S.E.2d 449 (2009).

Likewise, in reviewing Mr. Vilela's alternative theory challenging the sufficiency of evidence for conviction,

[t]he function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Syl. pt. 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995). Notably, with respect to issues raising the sufficiency of evidence, this Court has explained that

[a] criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

Syl. pt. 3, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

Having set out the standards governing our review of this case, we proceed to address the issues raised.

23

## III.

## DISCUSSION

In our discussion below, we first will address Mr. Vilela's argument that the trial court erred in admitting the entirety of his statement to law enforcement when a portion of the statement was made after he invoked his right to counsel. We then will consider Mr. Vilela's argument regarding the denial of his motion for judgment of acquittal and the sufficiency of evidence supporting his conviction.

### A. *Admissibility of Entire Audio Statement*

In its order admitting Mr. Vilela's statement, the trial court properly set forth findings of fact. The trial court found that Mr. Vilela was "clearly in custody" and was provided his *Miranda* warnings in question and answer format. Further, the trial court found that, after some communication, Mr. Vilela "clearly invoked" his right to counsel. However, the trial court found that, after requesting counsel, Mr. Vilela continued to talk. Trooper Hill cautioned Mr. Vilela that he could talk to law enforcement or he could have an attorney. The trial court additionally found that Trooper Hill did not refuse to get Mr. Vilela's iPhone in order to coerce his statement. Rather, the trial court found that Trooper Hill was simply advising Mr. Vilela of the method by which his iPhone could be retrieved. Mr. Vilela told Trooper Hill he could proceed with questions, and Mr. Vilela continued to respond to

24

questioning. Additionally, the trial court found that Trooper Hill's demeanor toward Mr. Vilela was not threatening and was "actually rather gentle."

Mr. Vilela argues that his recanting of his request for counsel was induced by Trooper Hill's refusal to look for Mr. Vilela's iPhone in the event he invoked his right to have a lawyer. He contends that it was clear the iPhone was important as he believed the video of Ms. Dyall would establish the truth of his story and thereby clear him of any criminal allegations. Mr. Vilela also asserts that he did not know the iPhone would be recovered in the investigation. He argues that, for all he knew the Trooper would dispose of the iPhone as the Trooper had exhibited "great disdain and antagonism" toward him.

The portion of the statement of objectionable concern to Mr. Vilela is his "damning" statement: "I will be going to jail forever." Mr. Vilela argues that the remark was prejudicial in that it easily allowed the jury to discount his defense.

In contrast, the State argues that Mr. Vilela recanted his request for counsel by initiating conversation almost immediately after requesting counsel. According to the State, Mr. Vilela had been *Mirandized* properly, and Trooper Hill again cautioned Mr. Vilela about not talking if he wanted counsel.

The only issue as to the statement is whether Mr. Vilela recanted his request for counsel. The law regarding custodial statements, questioning or interrogation is well-established. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), stands for the fundamental principle that, prior to custodial interrogation, a defendant must be advised that he or she has a right to remain silent, warned that anything he or she says can and will be used against him or her, and told that he or she has a right to an attorney. *Id.* at 479, 86 S. Ct. at 1630, 16 L. Ed. 2d 694. Pursuant to the *Miranda* decision, if a defendant, upon being advised of his or her rights, states that he or she wishes to remain silent or wants an attorney present, all questioning and interrogation must stop. *Id.* at 474, 86 S. Ct. at 1628, 16 L. Ed. 2d 694. While "the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement," such a waiver must not be the result of the individual being "threatened, tricked or cajoled" by law enforcement. *Id.* at 479 & 476, 86 S. Ct. at 1630 & 1628, 16 L. Ed. 2d 694.

This Court previously has held:

> Once a suspect in custody has expressed his clear, unequivocal desire to be represented by counsel, the police must deal with him as if he is thus represented. Thereafter, it is improper for the police to initiate any communication with the suspect other than through his legal representative, even for the limited purpose of seeking to persuade him to reconsider his decision on the presence of counsel.

26

Syl. pt. 1, *State v. McNeal*, 162 W. Va. 550, 251 S.E.2d 484 (1978). We also held in Syllabus points 1 and 3 of *State v. Bradley*, 163 W. Va. 148, 255 S.E.2d 356 (1979), that once a request for counsel is made, counsel must be obtained within a reasonable time and no questioning can be conducted in the interim unless the request for counsel is recanted prior to counsel being obtained with reasonable dispatch.

Likewise, in *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378, *reh'g denied*, 452 U.S. 973, 101 S. Ct. 3128, 69 L. Ed. 2d 984 (1981), the United States Supreme Court held that once an accused asks for counsel during a custodial interrogation, he is not subject to further interrogation by law enforcement until counsel has been made available to him, "unless the accused himself initiates further communication, exchanges or conversations with the police." *Id.* at 484-85, 86 S. Ct. at 1885, 68 L. Ed. 2d 378.

As to recanting a request for counsel, this Court has also held: "For a recantation of a request for counsel to be effective: (1) the accused must initiate a conversation; and (2) must knowingly and intelligently, under the totality of the circumstances, waive his right to counsel." Syl. pt. 1, *State v. Crouch*, 178 W. Va. 221, 358 S.E.2d 782 (1987).

Our review of the audio recorded statement plainly establishes that Mr. Vilela was *Mirandized* and knowingly and voluntarily proceeded to answer questions. It is undisputed that Trooper Hill thanked Mr. Vilela and immediately ceased questioning once Mr. Vilela requested counsel. One can hear movement on the audio recording consistent with Trooper Hill preparing to exit the vehicle. Within seconds of Trooper Hill starting to exit the cruiser, Mr. Vilela initiated further conversation with Trooper Hill. There was no prompting or cajoling by Trooper Hill. There was no strategy "under any guise or by any artifice" to elicit a confession in the absence of counsel on the part of Trooper Hill. *See* Syl. pt. 1, *State v. Bradley*, 163 W. Va. 148, 255 S.E.2d 356 (1979). Indeed, Trooper Hill cautioned Mr. Vilela that talking needed to stop if Mr. Vilela wanted counsel. Trooper Hill proceeded to explain to Mr. Vilela that he could talk with the Trooper or stop talking and have the Trooper get him a lawyer and then everything would be done through the lawyer. Mr. Vilela's immediate initiation of conversation made his request for counsel equivocal. Trooper Hill's cautions were directed toward determining whether Mr. Vilela wanted talking to cease so that counsel could be obtained. Moreover, the objected to remark, "I will be going to jail forever," was spontaneously uttered by Mr. Vilela. The utterance was not made in response to any questioning by Trooper Hill. Thereafter, Mr. Vilela told Trooper Hill that he could go ahead and ask questions.

Our review of the audio recording and transcript of the statement together with the evidence established at the suppression hearing compels the conclusion, under the totality of the circumstances, that this process was not a situation where a law enforcement officer improperly attempted to "wring" a confession out of an individual. No questioning was initiated by Trooper Hill directed toward testing or weakening the resolve of Mr. Vilela in his request for a lawyer. Rather, the record is plain that, upon Mr. Vilela's request for an attorney, Trooper Hill promptly stopped questioning and was exiting the cruiser when Mr. Vilela, on his own, almost immediately initiated further communication. The Trooper proceeded to warn Mr. Vilela that talking could continue or stop and, if talking stopped, everything from that point would be done through the attorney. There is no refusal to recover the iPhone if Mr. Vilela chose to have a lawyer. We also note that the statement was not obtained through protracted questioning or deprivation of necessities. Indeed, the audio recording of the entirety of the statement is merely sixteen minutes in length.

Accordingly, we find that Mr. Vilela recanted his request for counsel by initiating further conversation and by knowingly and intelligently waiving his right to counsel. The trial court applied the correct legal standard in determining that Mr. Vilela's statement was voluntary. We further conclude, under the totality of the circumstances, the

29

decision of the trial court to admit the statement of Mr. Vilela in its entirety was not plainly wrong or against the weight of the evidence.[7]

## B. *Judgment of Acquittal and Sufficiency of Evidence*

When the State rested its case-in-chief, Mr. Vilela unsuccessfully moved for a judgment of acquittal pursuant to Rule 29 of the West Virginia Rules of Criminal Procedure arguing that there were inconsistencies and bias in the testimony of the State's witnesses. Upon the conclusion of all the evidence, Mr. Vilela renewed his motion for judgment of acquittal which again was denied. Subsequent to the jury verdict, Mr. Vilela again renewed his motion for a judgment of acquittal and argued alternatively that the verdict was contrary to the evidence.

---

[7]We observe that, even if we found that Mr. Vilela had not revoked his request for counsel by initiating conversation and knowingly and intelligently waiving his right to counsel, we would have found harmless error in the admissibility of the entirety of the statement. We note that, excluding the statement "I will be going to jail forever," all remarks made subsequent to the request for counsel bore no substantial difference to the portion of the statement to which there is no objection. Given the overwhelming and sufficient evidence offered by the State, the sentence challenged by Mr. Vilela had no prejudicial impact. Thus, we would find that it was harmless error beyond a reasonable doubt to admit the entirety of the statement. *See* Syl. pt. 14, *State v. Salmons*, 203 W. Va. 561, 509 S.E.2d 842 (1998) ("Failure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt.").

Regarding this second assignment of error, Mr. Vilela argues that no rational jury could conclude beyond a reasonable doubt that he intentionally took Ms. Dyall from her residence against her will. In support of his position, Mr. Vilela points to Ms. Dyall's testimony that she was beaten with a stick or a piece of wood, but no such weapon was recovered. Thus, Mr. Vilela asserts that Ms. Dyall's credibility is in question. He also argues that the photographs of Ms. Dyall taken at the hospital show no signs of Ms. Dyall's mouth, hands and ankles being bound with tape in plain contrast to the testimony of Ms. Dyall that she was bound and held against her will.

Mr. Vilela additionally asserts that Ms. Dyall's testimony is disproved by the fact that he hid his iPhone from Ms. Dyall so as to keep it safe and preserve her confession to poisoning a man. Mr. Vilela contends that his act of hiding the iPhone proves that Ms. Dyall was free to move about the house. Otherwise, there would have been no reason to hide it. He further asserts that Ms. Dyall's confession, recorded on the iPhone, was detailed to such a degree that the confession had to be true.

Mr. Vilela points to other inconsistencies to support his position that the evidence against him was insufficient. He states that Ms. Dyall embellished or lied about being thrown into the trunk of her car, explaining that the car was a hatchback and did not have a trunk. Moreover, he contends that Ms Dyall was able to move about his house freely

31

and unrestrained. She was left alone in the home and was not restrained when he left the residence, yet she made no effort to escape or contact authorities.

The State argues that the jury had sufficient evidence establishing that Mr. Vilela abducted Ms. Dyall from her home and kept her locked up in his home for ten days. Pointing out that the testimony of Mr. Vilela corroborated significant aspects of Ms. Dyall's testimony, the State contends that the bulk of Mr. Vilela's argument is directed at the issue of Ms. Dyall's credibility, which is the province of the jury.

The record establishes that Ms. Dyall testified to her kidnaping and restraint at the hands of Mr. Vilela. She described being placed in an attic room where the window was secured with boards and screws. According to her testimony, toward the end of her captivity, she was permitted to be unrestrained in the main floor of the house when Mr. Vilela was present. However, all the doors and windows were screwed shut. Ms. Dyall testified at length about both Mr. Vilela's efforts to extort money from her and how he forced her to confess that she poisoned a man.

In many ways, the testimony of Ms. Dyall and Mr. Vilela is substantively the same, differing only in terms of Mr. Vilela's explanations for certain things. For instance, he claimed the screws in doors and windows and boarded up areas were because the

32

residence was in a high crime area and had previously been vandalized. Mr. Vilela further claimed that he and Ms. Dyall were good friends, she was at his home voluntarily, and she wanted to help him with money to pay for her wrongs. Significantly, Ms. Dyall's testimony regarding the terrifying circumstances of her presence in Mr. Vilela's home was fully supported by the testimony of the police officers who found her and accomplished her release, as well as by her friends who became concerned and reported her missing, and by her financial advisors. Her testimony also is supported by the physical evidence of her severely broken arm, which required surgery, plates, and screws to repair, as well as the abrasions and bruising over her body as seen by the rescuing officers and in photographs.

This Court need not dwell on this issue. As we observed, Mr. Vilela has a "heavy burden" in challenging the sufficiency of the evidence. Syl. pt. 3, *State v. Guthrie,* 194 W. Va. 657, 461 S.E.2d 163. Mr. Vilela's arguments are solely directed at the weight of the evidence and at challenging Ms. Dyall's credibility. Thus, Mr. Vilela cannot meet his heavy burden in challenging the denial of his motion for acquittal or the sufficiency of the evidence supporting his conviction. Credibility determinations are the prerogative of the jury and not an appellate court. *Id.* Moreover, on review, this Court will not weigh evidence. Our review, conducted on a cold record, is not a tool to replace the finding of the jury with our own judgment. The question for us is "whether, after viewing the evidence in the light

33

most favorable to the prosecution, any trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." *Id*. at Syl. pt. 1.

The credibility and inconsistency arguments raised by Mr. Vilela were presented to the jury through the testimony of witnesses. Mr. Vilela had the opportunity to, and did, fully question witnesses and develop his theories of the case. Mr. Vilela's arguments are unavailing. Viewing all the evidence in the light most favorable to the prosecution and crediting all inferences and credibility assessments the jury might have drawn, we conclude that there was substantial evidence upon which the jury could find Mr. Vilela guilty beyond a reasonable doubt. Specifically, with the evidence before it, any rational trier of fact could readily conclude, beyond a reasonable doubt, that Mr. Vilela unlawfully restrained Ms. Dyall with the intent to hold her for reward or concession. *See* W. Va. Code § 61-2-14(a) (2012) (Repl. Vol. 2014) (Kidnaping). Likewise, a rational jury could have found, beyond a reasonable doubt, that Mr. Vilela threatened injury or accused Ms. Dyall of an offense in a failed effort to extort money or gain pecuniary benefit. *See* W. Va. Code § 61-2-13 (1923) (Repl. Vol. 2014) (Attempted Extortion). Thus, we find no error in the circuit court's rulings.

**IV.**

**CONCLUSION**

Based upon the foregoing analysis, we affirm the judgment of the Circuit Court of Berkeley County convicting Mr. Vilela of the felony offense of kidnaping, with a recommendation of mercy, and of the misdemeanor offense of attempted extortion.

Affirmed.